# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

KRISTIAN T. PARKS,         )
                                )
        *Plaintiff*,       )      Case No. 1:23-cv-309
                                )
v.                        )      Judge Atchley
                                )
DEIBEL LABORATORIES OF     )      Magistrate Judge Steger
TENNESSEE, LLC and COLLEEN M.  )
SCARBROUGH,            )
                                )
        *Defendants*.     )

## MEMORANDUM OPINION AND ORDER[1]

Before the Court are Defendants Deibel Laboratories of Tennessee, LLC and Colleen M. Scarbrough's Motion for Summary Judgment [Doc. 128], their Motion in Limine No. 1 [Doc. 147], their Motion in Limine No. 2 [Doc. 148], their Motion in Limine No. 3 [Doc. 149], and their Motion in Limine No. 4 [Doc. 150]. For the following reasons, Defendants' Motion for Summary Judgment [Doc. 128] is **GRANTED**, and their Motions in Limine [Docs. 147–50] are **DENIED AS MOOT**.

## I.     BACKGROUND

This is an employment discrimination case. Defendant Deibel Laboratories of Tennessee, LLC provides microbiology, chemistry, allergen, and nutritional label testing services for private food, beverage, and consumer products companies. [Doc. 129-1 at 3, 23].[2] On February 14, 2023,

---

[1] As an initial matter, Plaintiff spends a portion of her response to Defendant's Motion for Summary Judgment attempting to relitigate matters the Court has already ruled on. [*See* Doc. 130 at 19–24]. To the extent Plaintiff seeks reconsideration of the Court's prior Orders through her response, her request is denied as she has not presented any argument that justifies reconsideration of the Court's prior decisions, and "[she] cannot seek affirmative relief through a responsive filing." *Axis Dynamics, Inc. v. Knox Cnty.*, No. 3:24 -cv-329, 2025 LX 276359, at *1 n.1 (E.D. Tenn. June 24, 2025) (Atchley, J).

[2] Plaintiff objects to three declarations Defendants have provided in support of their Motion for Summary Judgment, [Doc. 129-1 at 3–22 (Declaration of Kimberly Cook with Exhibits), 23–31 (Declaration of Colleen Scarbrough with

Deibel offered Plaintiff Kristian T. Parks, an African American woman, a "Laboratory Technician I" position at its Ooltewah, Tennessee, laboratory. [*Id.* at 3–4, 82–84; Doc. 12 at ¶ 9]. Parks accepted this offer and started working in the Ooltewah lab's Microbiology Department a week later. [Doc. 129-1 at 4, 22, 84]. In the first few weeks of Parks's employment, several employees complained that she "did not have a good attitude and was unable to pick up basic level tasks."[3] [*Id.* at 4, 25]. Based on these complaints, Parks was transferred to a "Lab Aide" position in the Ooltewah lab's Media Department. [*Id.*]. The goal of this transfer—which did not affect Parks's compensation—was to improve Parks's performance by placing her in a role consisting of routine work with set instructions. [*Id.* at 4, 25, 44, 215–16].

The Media Department creates the culture media that other lab departments use for quality control and testing. [*Id.* at 25]. As a Media Department Lab Aide, it was Parks's job to assist in creating enrichments for testing bacteria and to sterilize various containers. [*Id.* at 5, 25, 45]. Michael Jeffrey, an African American man who also worked in the Media Department, repeatedly complained about Parks after she was transferred. [*Id.* at 25]. He expressed concerns about Parks's lack of performance and need to take excessive breaks to Defendant Colleen M. Scarbrough,

Exhibits), and 32–34 (Declaration of Charles Deibel)], and asks the Court to exclude them on the grounds they "are not in compliance with 28 U.S.C. § 1746(2) requirements and are fraudulent." [Doc. 130 at 1]. Plaintiff's objection is without merit. The Court may consider an unsworn declaration on summary judgment provided "the declaration is made under penalty of perjury, certified as true and correct, dated, and signed." *Pollock v. Pollock*, 154 F.3d 601, 611 n.20 (6th Cir. 1998) (citing 28 U.S.C. § 1746; *Williams v. Browman*, 981 F.2d 901, 904 (6th Cir. 1992)). Here, each of the challenged declarations (1) states "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct[,]" (2) is dated, and (3) is signed by the declarant. [Doc. 129-1 at 8, 28, 34]. Accordingly, the Court may consider the declarations. *Pollock*, 154 F.3d at 611 n.20. As for Plaintiff's contention that the declarations are fraudulent, this argument appears to be based on nothing more than Plaintiff's disagreement with the declarations' contents. [*See* Doc. 130 at 13–16]. If Plaintiff believes the declarations are inaccurate, her recourse was to direct the Court to conflicting evidence that demonstrates a genuine dispute of material fact, not to seek the declarations' exclusion.

[3] Plaintiff takes issue with the fact that Defendants have not produced any firsthand documents relating to these complaints. [*See* Doc. 130 at 5, 14]. To the extent Plaintiff is attempting to object to Defendants' reference to these complaints on hearsay grounds, the Court may consider the complaints for the effect they had on the listener, *i.e.*, Defendants. *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 379 (6th Cir. 2009) ("A statement that is not offered to prove the truth of the matter asserted but to show its effect on the listener is not hearsay.").

2

Operations Team Leader for the Ooltewah lab. [*Id.* at 23, 25]. He also requested that someone else be assigned to the Media Department in lieu of Parks because of her attitude. [*Id.* at 25]. These complaints, along with complaints made against Parks by other Deibel employees, were brought to the attention of Kimberly Cook, Deibel's Director of Human Resources. [*See id.* at 3, 5, 26]. In response, Cook directed Scarbrough to meet with Parks to address Parks's performance issues. [*Id.* at 5, 26].

Scarbrough met with Parks as directed on April 4, 2023. [*Id.* at 5, 9–10, 26, 29–30]. Aveiona Allen, the Ooltewah lab's training ambassador, was also present for this meeting. [*Id.* at 5, 9–10, 26, 29–30, 48, 215–16]. Scarbrough explained to Parks that she was expected to complete three runs of "jug media" daily, that she was to wash all milk jugs daily and that it would sometimes be necessary for Parks to sacrifice her breaks. [*Id.* at 9–10, 26, 29–30, 47–48, 204–05]. Parks responded by attempting to explain why she was unable to meet expectations, but her comments were largely ignored. [*Id.* at 11–14, 206–08]. Two days later, Parks emailed Cook to complain about Scarbrough's conduct during the April 4th meeting. [*Id.* at 11–14, 48–49, 206–08]. Parks accused Scarbrough of making "condescending remarks[,]" engaging in "rude behavior[,]" and generally being "unprofessional, demeaning, [and] hostile[.]" [*Id.* at 12, 206; *see also* Doc. 130-1 at ¶ 8 (stating that Scarbrough "would often times [sic] use vulgar profanity; was verbally abusive; antagonistic; [and] hostile to [Parks] by yelling.")]. She also asserted that Scarbrough ignored her responses during the meeting. [Doc. 129-1 at 14, 208]. Finally, Parks asserted the Media Department was understaffed and defended her use of breaks, stating that she only took breaks in accordance with Deibel's guidelines. [*Id.*]. Nothing in Parks's complaint referenced race or suggested that Scarbrough's conduct may have been racially motivated. [*See id.* at 12–14, 51, 206–08; *see also* Doc. 130-1 at ¶ 8].

Around the same time Scarbrough met with Parks, Deibel was visited by one of its clients, M&M Mars, for a routine audit and inspection. [Doc. 129-1 at 5, 26]. According to Parks, Deibel ordinarily prepared certain media using tap water as opposed to distilled water. [*See id.* at 45]. During the audit, however, Scarbrough instructed Parks to switch to distilled water when she gave a signal indicating the auditors were coming to the Media Department. [Doc. 130-1 at ¶ 6]. Parks did as she was instructed but later came to believe both that this switch was meant to deceive the auditors and that the use of tap water violated FDA regulations. [*See id.*; Doc. 129-1 at 38].

Also around the same time, Cook received additional complaints from Allen and Jeffrey concerning Parks's efficiency and time management. [Doc. 129-1 at 5]. In response, Cook directed Scarbrough to meet with the Media Department on April 7, 2023. [*Id.* at 5, 27]. Scarbrough met with the Media Department on April 7th as directed. [*Id.* at 27, 31; Doc. 130-1 at ¶ 9]. Scarbrough, Parks, Allen, and Jeffrey were present for the April 7th meeting. [Doc. 129-1 at 18–21, 27, 31]. During this meeting, Scarbrough discussed Parks's efficiency and time management, telling her that she needed to work faster. [*Id.* at 16–17, 27, 31; Doc. 130-1 at ¶ 9]. Parks attempted to defend herself, stating that she was going as fast as she could and that she did not want to break anything or improperly prepare media as that would result in another meeting. [Doc. 129-1 at 16–17, 27, 31, 210–11; Doc. 130-1 at ¶ 9]. Scarbrough then commented negatively on Parks's tone at which point Parks critiqued Scarbrough's tone during the April 4th meeting. [Doc. 129-1 at 16–17, 210–11]. Scarbrough responded by sending Parks home for the day. [*Id.*; Doc. 130-1 at ¶ 9].

Following this meeting, Scarbrough sent Cook an email that summarized the April 7th meeting, noted there were lab-wide complaints about Parks, and requested that Cook consider terminating Parks because "placing [Parks] anywhere in the Deibel lab will cause good workers to have resentment as well as bring down the standard of productivity." [Doc. 129-1 at 5, 15, 27, 31].

4

Parks also reached out to Cook following the April 7th meeting so she could file a second complaint against Scarbrough. [*Id.* at 6, 16–17, 210–11; Doc. 130-1 at ¶ 9]. In this complaint, Parks again accused Scarbrough of making "condescending remarks[,]" engaging in "rude behavior[,]" and generally being "unprofessional, demeaning, [and] hostile[.]" [Doc. 129-1 at 16–17, 210–11]. Parks also stated she was afraid to take her allotted breaks and that she was not allowed to make specific media during the M&M Mars audit "because [Scarbrough] did not want MARS auditors to catch us making this media and putting it into the autoclave." [*Id.*]. Following this written complaint, Parks also called Deibel's Human Resources Department to reiterate her concerns about Scarbrough's conduct. [*Id.* at 58–59; Doc. 130-1 at ¶ 10].

After receiving Parks's second complaint, Cook expanded the scope of her investigation into the situation, obtaining statements from Allen (who was present at both the April 4th and April 7th meetings) and Jeffrey (who was present at the April 7th meeting). [Doc. 129-1 at 6–7, 18–21]. After reviewing these statements—both of which negatively commented on Parks's attitude and work ethic—Cook decided to terminate Parks's employment. [*Id.* at 8, 18–21]. Parks's employment was formally terminated on April 12, 2023. [*Id.* at 8, 22]. The cited reasons for her termination were (1) "Not meeting adequate or expected progress in learning and performing the duties of a Laboratory Technician position for which [she] was hired[,]" and (2) "Conflicts with teams and management within [Deibel's] organization." [*Id.*]. Following Parks's termination, she was replaced by Collin Wilson, a white man. [*Id.* at 57; Doc. 130-1 at ¶ 12].

This lawsuit followed. [Doc. 1]. The currently operative Amended Complaint alleges claims of (1) racial discrimination under Title VII of the Civil Rights Act of 1964, the Tennessee Human Rights Act ("THRA"), and 42 U.S.C. § 1981; (2) retaliation under Title VII, the THRA,

and Section 1981; (3) hostile work environment under Title VII and the THRA;[4] (4) retaliatory discharge in violation of the Tennessee Public Protection Act ("TPPA"); (5) breach of contract under Tennessee law; (6) intentional and negligent infliction of emotional distress under Tennessee law; and (7) various federal and state law fraud and False Claims Act claims. [Doc. 6]. Plaintiff's fraud and False Claims Act claims have already been dismissed. [Doc. 118 at 5–9]. Now, Defendants move for summary judgment as to Plaintiff's remaining claims. [Doc. 128]. For the reasons discussed below, Defendants are entitled to their requested relief.

## II.      STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 instructs the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party asserting the presence or absence of genuine issues of material facts must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56 (c)(1). When ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th

---

[4] When discussing Plaintiff's hostile work environment claim, the Amended Complaint only expressly references Title VII. [Doc. 6 at ¶¶ 32–34]. Given, however, Plaintiff's *pro se* status, that Title VII and THRA hostile work environment claims are governed by the same standard, *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 n.1 (6th Cir. 2008), and the fact that the parties have briefed the Summary Judgment Motion as though Plaintiff brought a separate THRA hostile work environment claim, the Court construes the Amended Complaint as bringing hostile work environment claims under both Title VII and the THRA.

Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citations omitted).

The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial. *Anderson*, 477 U.S. at 248–49 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475–76 (6th Cir. 2010). A mere scintilla of evidence is not enough; there must be evidence from which a jury could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252; *Moldowan*, 578 F.3d at 374. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323

### III.   ANALYSIS

#### A.  Plaintiff's Insufficient Service of Process as to Scarbrough

In addition to arguing that all of Plaintiff's claims against Scarbrough fail on the merits, Defendants also assert the claims Scarbrough must be dismissed because Plaintiff has failed

properly serve Scarbrough in accordance with Federal Rule of Civil Procedure 4.[5] [Doc. 129 at 24–25]. The Court agrees.

"When the record fails to indicate the issuance of process and service upon the defendant in compliance with Rule 4, the district court does not acquire personal jurisdiction over the defendant and the complaint against him must be dismissed." *Watkins v. Kajima Int'l Corp.*, No. 3:08-0426, 2011 U.S. Dist. LEXIS 22203, at *10 (M.D. Tenn. Mar. 4, 2011). Here, Plaintiff attempted to serve Scarbrough via certified mail. [Doc. 20 at 2]. This is a permitted method of service in this District. *See* FED. R. CIV. P. 4(e)(1) (stating that a person may be serviced in a judicial district of the United States by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located…"); TENN. R. CIV. P. 4.04(10) (permitting plaintiffs to serve defendants via mail). But "[w]hile the Tennessee Rules of Civil Procedure permit service by mail, unless the package is actually received and signed for by the defendant or his 'authorized agent,' service of process by mail delivery is not effective." *Fite v. Nashville*, 686 F. Supp. 2d 735, 746 (M.D. Tenn. 2010); *see also* TENN. R. CIV. P. 4.03(2) ("When process is served by mail…the return receipt shall be sent to and filed by the clerk.").

Plaintiff never filed a return receipt regarding the Summons and copy of the Amended Complaint sent to Scarbrough at the Ooltewah lab, [*see* Doc. 20 at 2 (stating that Plaintiff "[did] not know when Mr. Scarbrough received the Summons and Amended Complaint")], likely because these documents were simply placed in the lab's mailbox without first obtaining a signature. [Doc. 129-1 at 28]. Because Plaintiff has not filed a return receipt indicating that Scarbrough signed for the Summons and Amended Complaint, she has not properly served Scarbrough. See *Fite*, 686 F. Supp. 2d at 746; TENN. R. CIV. P. 4.03(2). Accordingly, Plaintiff's claims against Scarbrough must

---

[5] Scarbrough has maintained she has not been properly served since she filed her Answer. [Doc. 16 at 5].

be dismissed without prejudice. *See* Fed. R. Civ. P. 4(m); *Silver v. Giles*, No. 1:07-cv-103, 2008 U.S. Dist. LEXIS 5522, at *5 (W.D. Mich. Jan. 25, 2008) (citing *Nafziger v. McDermott Int'l, Inc.*, 467 F.3d 514, 521 (6th Cir. 2006)).

Plaintiff attempts to avoid this conclusion by arguing she satisfies two of the factors that courts in the Sixth Circuit examine when determining whether to extend the time to serve a defendant absent good cause. [*See* Doc. 130 at 24]. In making this argument, Plaintiff appears to conflate whether an extension is warranted with whether service has been effectuated. [*See id.*]. To the extent Plaintiff is arguing that the Court should find Scarbrough has been served based on the two extension factors, this argument is without merit. The Court cannot deem a party served merely because an extension might be warranted. Additionally, to the extent Plaintiff intended to request an extension through her argument, the Court declines to grant her one. Plaintiff has not demonstrated good cause for her failure to timely serve Scarbrough and absent good cause, the Court retains discretion regarding whether to grant an extension. *United States v. Oakland Physicians Med. Ctr., LLC*, 44 F.4th 565, 568 (6th Cir. 2022). One of the factors the Court considers when determining whether to grant an extension absent good cause is "whether an extension of time would be well beyond the timely service of process[.]" *Id.* at 569. Here, Plaintiff was required to serve Scarbrough on or before March 26, 2024, *i.e.*, more than seventeen months ago. *See* FED. R. CIV. P. 4(m); [Doc. 1]. Considering this, an extension at this point would be improper, even if some of the other extension factors weigh in Plaintiff's favor. Accordingly, to the extent Plaintiff seeks an extension of time to serve Scarbrough, her request is denied. Furthermore, even if the Court did extend Plaintiff's time to serve Scarbrough or otherwise find that Scarbrough had been properly served, it would do nothing to save Plaintiff's claims against

9

Scarbrough as they would fail on the merits for the same reasons that Plaintiff's claims against Deibel fail on the merits. The Court turns to the merits now.

### B. Race Discrimination Under Title VII, the THRA, and Section 1981

Plaintiff claims that Defendants discriminated against her based on her race by both (1) requiring her to forego breaks during the workday and (2) terminating her. [*See* Doc. 6 at ¶¶ 20–25, 35–39, 45–51]. Plaintiff has not offered any direct evidence of discrimination in support of these claims.[6] Accordingly, whether either the break issue or Plaintiff's termination amount to unlawful race discrimination depends on whether her claims can survive the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001) ("Section 1981 claims are analyzed under the Title VII McDonnell Douglas/Burdine framework. Similarly, Tennessee courts have looked to federal case law applying the provisions of the federal anti-discrimination statutes as the baseline for interpreting and applying the Tennessee Human Rights Act." (internal citations and quotation marks omitted)).

Under *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case of discrimination by showing that (1) she is a member of a protected class; (2) she was qualified for the job and performed it satisfactorily; (3) she suffered an adverse employment action; and (4) she was either replaced by a person outside her protected class or treated less favorably than similarly

---

[6] Direct evidence of discrimination is evidence that, "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Examples of direct evidence include "a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group[.]" *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000); *see also Erwin v. Potter*, 79 F. App'x 893, 897 (6th Cir. 2003) ("This circuit has provided the statement 'I fired you because you are disabled' as an example of direct evidence. Racial slurs or statements that suggest that the decision-maker relied on impermissible stereotypes to assess an employee's ability to perform can constitute direct evidence." (internal citation omitted)).

situated individuals outside her protected class. *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015). If a plaintiff establishes her *prima facie* case, then the burden shifts to the defendant employer to "articulate some legitimate, nondiscriminatory reason for the [adverse action]." *McDonnell Douglas Corp.*, 411 U.S. at 802. Once the defendant employer provides such a reason, the burden shifts back to the plaintiff "to prove that the reasons proffered by the defendant were not its true reasons, but were mere pretexts for prohibited discrimination." *Wheat*, 785 F.3d at 237. A plaintiff can establish pretext "by offering evidence that (1) the employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014).

In this case, Defendants argue that Plaintiff cannot establish a *prima facie* case of race discrimination regarding either the break issue or Plaintiff's termination. [Doc. 129 at 14–17]. They further argue that even if Plaintiff was able to establish a *prima* facie case, they have provided legitimate, nondiscriminatory reasons for their actions which Plaintiff has failed to establish are pretextual. [*Id.*]. As detailed below, the Court agrees with Defendants that Plaintiff cannot prevail on her race discrimination claims.

### 1. *Break Issue*

Denying an employee breaks generally does not amount to an adverse employment action because it "do[es] not change [the] employee's salary, benefits, title, or work hours, even if [it] make[s] the employee's job significantly more difficult." *Worthy v. Materials Processing, Inc.*, 433 F. App'x 374, 376 (6th Cir. 2011) (cleaned up); *see also Grimsley v. Marshalls of MA*, Inc., 284 F. App'x 604, 609 (11th Cir. 2008) (employee did not suffer adverse employment action when supervisor denied him breaks despite allowing employees outside of protected class to take

breaks). That said, even if the Court assumes Plaintiff's circumstances justify disregarding this general rule and that Plaintiff can otherwise establish a *prima facie* case of race discrimination, Defendants have presented a legitimate, nondiscriminatory reason for denying Plaintiff breaks at times: the Media Department's heavy workload. The undisputed evidence shows that whether Defendants permitted employees to take breaks depended on the employee's workload. [*See* Doc. 129-1 at 4, 9–10, 24, 26, 29–30]. And as Plaintiff herself acknowledges, the Media Department's workload could be intense. [*See id.* at 13 (stating that She and Jeffry were "overwhelmed in the Media Department") and 57 (stating that she believed the Media Department needed another employee due to its workload); *see also id.* at 26, 29–30 (noting that Plaintiff was required to do three runs of jug media daily and that all milk jugs were to be washed daily)]. Accordingly, Defendants had a legitimate, nondiscriminatory reason for denying Plaintiff breaks, and Plaintiff has failed to show that this proffered reason is pretextual.

Plaintiff attempts to show pretext by arguing that white employees were permitted to take breaks while she was not. [Doc. 130 at 2–3; *see also* Doc. 130-1 at ¶ 4]. "A plaintiff may demonstrate pretext by showing that similarly situated employees were treated more favorably." *Maben v. Sw. Med. Clinic, P.C.*, No. 1:13-CV-738, 2015 U.S. Dist. LEXIS 8924, at *8 (W.D. Mich. Jan. 27, 2015). To be similarly situated, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). In this case, Plaintiff has failed to identify such a comparator. She claims that Blake Hodson, Sarah Goins, and Hunter Thorn (all purportedly white) were allowed to take breaks despite "work[ing] in the Media Dept. on occasion

and on [her] days off." [Doc. 130 at 3]. But she has failed to support this contention with any evidence suggesting that Hodson, Goins, or Thorn are similarly situated to her. For example, Plaintiff has not directed the Court to any evidence suggesting that Hodson, Goins, or Thorn—to the extent they even worked in the Media Department—were allowed to take breaks in circumstances where Plaintiff would have been denied a break on workload grounds. Plaintiff has also failed to direct the Court to any evidence concerning either who supervised Hodson, Goins, and Thorn or whether they were subject to the same standards as Plaintiff. Given this dearth of evidence, the Court cannot find that Plaintiff has identified a similarly situated employee. *See Mitchell*, 964 F.2d at 583. Accordingly, Plaintiff cannot demonstrate pretext, and any race discrimination claim she may have based on the break issue must be dismissed.

### 2. *Termination*

Defendants argue Plaintiff cannot establish a *prima facie* case of race discrimination regarding her termination because she was not qualified for her position, as evidenced by her deficient work performance. [Doc. 129 at 14–15]. Defendants further argue that Plaintiff's deficient performance and her conflicts with team members—as set forth in Plaintiff's termination letter—were legitimate, nondiscriminatory reasons for her termination. [*Id.* at 15]. Finally, Defendants argue that Plaintiff cannot prove these reasons are a mere pretext for discrimination. [*Id.* at 15–16].

"Under the *McDonnell Douglas* test, concerns about a plaintiff's performance are more appropriately raised as part of the second and third steps of the scheme." *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 587–88 (6th Cir. 2002) (cleaned up). Accordingly, the Court will presume that Plaintiff was qualified for her position at Deibel notwithstanding her performance issues. This, however, does little to save Plaintiff's claim because even assuming Plaintiff can

13

establish the other elements of her *prima facie* case, her poor work performance was a legitimate, nondiscriminatory reason for her termination, *Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 546 (6th Cir. 2008), and she has failed to demonstrate this reason was pretextual.

Plaintiff argues that the break issue, her termination letter, and an internal "Associate Corrective Action" from Deibel establish pretext.[7] [Doc. 130 at 5]. The Court disagrees as Plaintiff has failed to show how any of them establish "that (1) [Deibel's] stated reason had no basis in fact, (2) the stated reason did not actually motivate [Deibel], or (3) the stated reason was insufficient to warrant the adverse employment action." *Loyd*, 766 F.3d at 590.

Starting with whether Plaintiff's poor work performance had a basis in fact, the undisputed evidence shows that Plaintiff's performance was not meeting Defendants' expectations. [*See* Doc. 129-1 at 4–10, 22, 24–27, 29–31, 47–48]. The break issue does not call this conclusion into question. If anything, that Plaintiff had to forego breaks in her attempt to meet expectations demonstrates that she was not working as efficiently as Defendants required. As for the termination letter and Associate Corrective Action, neither suggests that Plaintiff was meeting expectations. [*See id.* at 22; Doc. 130-3 at 44]. To the contrary, both reiterate that Plaintiff's performance was deficient, further reinforcing the conclusion that Plaintiff's poor performance has a basis in fact. [*See* Doc. 129-1 at 22; Doc. 130-3 at 44].

Looking next to whether Plaintiff's poor work performance did not actually motivate her termination, she has failed to introduce any evidence showing this is the case. That Plaintiff was unable to take breaks when the Media Department was experiencing heavy workloads does not in

---

[7] Defendants assert that the Court should not consider the Associate Corrective Action when ruling on their Motion for Summary Judgment as the document is not properly authenticated. [Doc. 132 at 6 n.3]. It, however, is unnecessary for the Court to determine whether the Associate Corrective Action is properly considered at this stage of the proceedings because even assuming it is admissible, it does not alter the Court's conclusion that Plaintiff's discrimination claims must fail.

14

any way suggest that she was terminated for reasons other than her poor work performance. Plaintiff's termination letter and Associate Corrective Action similarly do not suggest that something other than Plaintiff's poor work performance motivated her termination. Rather, these documents reinforce the conclusion that Plaintiff was terminated because her work was not meeting expectations. [*See* Doc. 129-1 at 22; Doc. 130-3 at 44].

Finally, as to whether Plaintiff's poor work performance was insufficient to warrant her termination, it should go without saying that an employer may justifiably terminate an employee whose performance is not meeting the employer's expectations. *See Imwalle*, 515 F.3d at 546. Nothing about the break issue, Plaintiff's termination letter, or the Associate Corrective Action changes this. Accordingly, Plaintiff cannot establish that Defendants' proffered reason for her termination is pretextual, and her race discrimination claim based on her termination must be dismissed.[8]

### C. Retaliation Under Title VII, the THRA, and Section 1981

Plaintiff claims she was terminated in retaliation for reporting Scarbrough's conduct to Deibel's Human Resources Department in violation of Title VII, the THRA, and Section 1981. [*See* Doc. 6 at ¶¶ 25, 40–44, 52–58]. Plaintiff, however, has failed to introduce any direct evidence of retaliation, *see Imwalle*, 515 F.3d at 543–44 ("Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action."), and she has similarly failed to establish a *prima facie* case of retaliation

---

[8] Having found Plaintiff cannot establish pretext as to the poor work performance justification for her termination, it is not necessary for the Court to address Defendants' second proffered reason for Plaintiff's termination, her conflicts with co-workers and management. *See Marsico v. Sears Holding Corp.*, No. 06-10235, 2011 U.S. Dist. LEXIS 36545, at *21 (E.D. Mich. Apr. 4, 2011) ("[W]here more than one [legitimate, nondiscriminatory] reason is proffered, it is Plaintiff's burden 'to show that *each* proffered reason is merely a pretext for illegal discrimination.'" (emphasis in original) (quoting *Kestner v. Stanton Grp., Inc.*, 202 F. App'x 56, 60 (6th Cir. 2006)).

15

based on circumstantial evidence. Accordingly, her Title VII, THRA, and Section 1981 retaliation claims must be dismissed.

"Retaliation claims pursuant to Title VII, Section 1981 and the THRA are analyzed under the same framework." *Pendleton v. Bob Frensley Chrysler Jeep Dodge Ram, Inc.*, No. 3:14 C 02325, 2016 U.S. Dist. LEXIS 66219, at *23 (M.D. Tenn. May 19, 2016). Under this framework, a plaintiff must first establish a *prima facie* case of retaliation by showing that (1) she engaged in protected activity; (2) the defendant knew she had engaged in protected activity; (3) she suffered an adverse employment action; and (4) there is a causal connection between her protected conduct and the adverse employment action. *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 860 (6th Cir. 1997). If a plaintiff establishes a *prima facie* case of retaliation, then, just as with discrimination claims, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. *Mansfield v. City of Murfreesboro*, 706 F. App'x 231, 236 (6th Cir. 2017). Once a defendant provides such a reason, the burden then shifts back to the plaintiff to show that the defendant's proffered reason is pretextual. *Id.*

In this case, Defendants argue that Plaintiff cannot establish a *prima facie* case of retaliation because there is no evidence indicating she participated in protected activity. [Doc. 129 at 17–18]. The Court agrees. "Protected conduct includes complaining to anyone about allegedly unlawful practices." *Jenkins v. Regents of the Univ. of Mich. Health Sys.*, 763 F. App'x 545, 552 (6th Cir. 2019) (cleaned up). Importantly, however, such complaining only qualifies as protected activity if the plaintiff objects to the allegedly unlawful conduct based on her membership in a protected class. *Id.*; *see also Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 592 (6th Cir. 2007) (holding that an employee did not engage in protected activity where "there [was] simply no evidence in the record that [plaintiff] told [his manager] that he had been discriminated against on the basis of his

16

[protected characteristic]"); *Balding-Margolis v. Cleveland Arcade*, 352 F. App'x 35, 45 (6th Cir. 2009) (holding same where the plaintiff's multiple complaints to management did not indicate that she "was objecting to discriminatory conduct against her based on her membership in a protected class"); *Longs v. Ford Motor Co.*, 647 F. Supp. 2d 919, 932–33 (W.D. Tenn. 2009) ("'Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient.'" (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)); *Love v. ProQuest, LLC*, No. 18-10455, 2019 U.S. Dist. LEXIS 26979, at *11 (E.D. Mich. Feb. 20, 2019) ("In order for [plaintiff's] complaints to be deemed protected activity under Title VII, [plaintiff] had to go beyond general claims of unequal treatment and specifically complain about race discrimination.").

Here, Plaintiff's complaints do not indicate she objected to racially discriminatory conduct. [*See* Doc. 129-1 at 12–14 (Plaintiff's April 6, 2023, Complaint to HR), 16–17 (Plaintiff's April 7, 2023, Complaint to HR), 58 (noting that Plaintiff called HR to report the same conduct described in her written complaints)]. The complaints do not even mention race. [*Id.*]. Instead, they merely accuse Scarbrough of being generally "unprofessional, demeaning, [and] hostile[.]" [*Id.* at 12, 16]. Plaintiff complained that Scarbrough made "condescending remarks" and engaged in "rude behavior," but she never suggested these actions were linked to her race. [*See id.* at 12–14, 16–17]. Accordingly, Plaintiff has failed to establish that she engaged in protected conduct. *See, e.g.*, *Fox*, 510 F.3d at 592. As a result, she cannot establish a *prima facie* case of retaliation under Title VII, the THRA, or Section 1981. *See Avery Dennison Corp.*, 104 F.3d at 860. Furthermore, even if Plaintiff could establish a *prima facie* case, her claims would still fail because, as discussed *supra* Subsection III.B.2., Defendants had a legitimate, nondiscriminatory reason for terminating

Plaintiff, and she has failed to show this reason was pretextual. Accordingly, Plaintiff's Title VII, THRA, and Section 1981 retaliation claims must be dismissed.

### D.  Hostile Work Environment Under Title VII and the THRA

Plaintiff claims she was subjected to an "abusive hostile work environment" at Deibel. [Doc. 6 at ¶¶ 32–34]. To establish a *prima facie* race-based hostile-work-environment claim, a plaintiff must show that "(1) she is a member of a protected class; (2) she was subjected to unwelcomed racial harassment; (3) the harassment was race based; (4) the harassment unreasonably interfered with her work performance by creating an environment that was intimidating, hostile, or offensive; and (5) employer liability." *Clay v. United Parcel Servs., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007). Because Plaintiff has failed to introduce any evidence suggesting she was harassed based on her race, her hostile work environment claims must be dismissed.

"Harassment is based on race when it would not have occurred but for the plaintiff's race[.]" *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011)."A plaintiff may prove that harassment was based on race by either (1) direct evidence of the use of race-specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace." *Id.* In this case, Plaintiff has failed to produce either kind of evidence.

Plaintiff contends that Scarbrough was "unprofessional, demeaning, [and] hostile[,]" that she made "condescending remarks," and that she engaged in "rude behavior" including profanity. [Doc. 129-1 at 12–14, 16–17, 49; Doc. 130 at 2; Doc. 130-1 at ¶ 8]. But Plaintiff has never contended that Scarbrough—or anyone else at Deibel for that matter—used racially charged language. Accordingly, Plaintiff has no direct evidence that she was harassed based on her race.

*See Williams*, 643 F.3d at 511; *see also Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 791 (6th Cir. 2000) ("Personal conflict does not equate with discriminatory animus." (internal quotation marks omitted)).

Furthermore, Scarbrough's alleged comments and rudeness are of no use as comparative evidence since Plaintiff has failed to introduce any evidence suggesting that Scarbrough was kinder when speaking to non-African American employees.[9] The only potential comparative evidence Plaintiff has is her claim that Scarbrough allowed white employees in other lab departments to take their breaks while prohibiting Plaintiff and Jeffrey, both African American, from doing so. But as the Court noted *supra* Subsection III.B.1., there was a legitimate, nondiscriminatory reason for not allowing Plaintiff and Jeffrey to take breaks at times, the Media Department's heavy workload. Considering this and the general lack of other evidence suggesting the denial of breaks was racially motivated, the undisputed evidence shows that Plaintiff was not harassed based on her race. *See Williams*, 643 F.3d at 511. Accordingly, Plaintiff's hostile-work-environment claims must be dismissed.

### E. Retaliation under the TPPA

Plaintiff claims she was terminated in retaliation for reporting FDA violations at the Ooltewah lab in violation of the TPPA. [Doc. 6 at ¶¶ 62–72]. To state a claim of retaliatory discharge under the TPPA, a plaintiff must show that (1) she "was an employee of the defendant;" (2) she "refused to participate in or remain silent about illegal activity;" (3) "the defendant employer discharged or terminated [her] employment;" and (4) "the defendant terminated [her]

---

[9] If anything, the evidence in the record suggests that Scarbrough speaks harshly as a general matter. [*See* Doc. 129-1 at 17 (stating that Plaintiff observed Scarbrough use profanity while on a phone call in the break room)]. While Plaintiff may object to this conduct, anti-harassment laws were "not designed to purge the workplace of vulgarity," *Black v. Zaring Homes*, 104 F.3d 822, 826 (6th Cir. 1997) (internal quotation marks omitted), nor do they "exist to ensure that everyone who works together enjoys one another's company or personality[,]" *Crabtree v. Johnson*, No. 2:12-cv-1206, 2014 U.S. Dist. LEXIS 119588, at *26 (S.D. Ohio Aug. 27, 2014).

employment solely for [her] refusal to participate in or remain silent about the illegal activity." *Williams v. City of Burns*, 465 S.W.3d 96, 111 (Tenn. 2015). Here, Plaintiff fails to satisfy both the second and fourth elements. Accordingly, her TPPA claim must be dismissed.

Starting with the second element, Plaintiff has failed to direct the Court to any evidence suggesting she "refused to participate in or remain silent about illegal activity." Plaintiff claims she refused to remain silent about Defendants using tap water to create media and cross contaminating two autoclaves, both allegedly in violation of FDA regulations. [Doc. 6 at ¶¶ 62–72]. If Deibel was governed by FDA regulations, then Plaintiff's claimed refusal may have been sufficient to establish the second element of her *prima facie* case. *See* TENN. CODE ANN. § 50-1-304(a)(3)(A) (defining "illegal activities" under the TPPA as "activities that are in violation of the criminal or civil code of [Tennessee] or the United States or any regulation intended to protect the public health, safety, or welfare"). But as nothing in the record establishes that Deibel is governed by the FDA, it was not illegal for Deibel to engage in activities the FDA prohibits entities under its jurisdiction from engaging in.

Plaintiff argues that the FDA's Laboratory Accreditation for Analyses of Foods ("LAAF") Program required Deibel to abide by FDA regulations. [*See* Doc. 130 at 15–16]. Plaintiff is incorrect. The LAAF Program is voluntary with labs only needing obtain an LAAF accreditation and abide by LAAF regulations if they intend to perform the specific types of food testing covered by the LAAF regulations. *See* Laboratory Accreditation for Analyses of Food, 86 Fed. Reg. 68728, 68729 (Dec. 3, 2021) (noting that the LAAF program is voluntary); 21 C.F.R. § 1.1103(b) ("A laboratory is subject to this subpart if it has been or is seeking to be LAAF-accredited by a recognized accreditation body to conduct food testing under this subpart."). These types of food testing are as follows:

Food testing must be conducted under this subpart whenever such testing is conducted by or on behalf of an owner or consignee:

(1) In response to explicit testing requirements that address an identified or suspected food safety problem, which are contained in the following provisions;

    (i)    Sprouts. Section 112.146(a), (c), and (d) of this chapter;

    (ii)    Shell eggs. Sections 118.4(a)(2)(iii), 118.5(a)(2)(ii) and (b)(2)(ii), and 118.6(a)(2) and (e) of this chapter; and

    (iii)    Bottled drinking water. Section 129.35(a)(3)(i) of this chapter (for the requirement to test five samples from the same sampling site that originally tested positive for Escherichia coli);

(2) As required by FDA in a directed food laboratory order issued under § 1.1108;

(3) To address an identified or suspected food safety problem and presented to FDA as part of evidence for a hearing under section 423(c) of the Federal Food, Drug, and Cosmetic Act prior to the issuance of a mandatory food recall order, as part of a corrective action plan under section 415(b)(3)(A) of the Federal Food, Drug, and Cosmetic Act submitted after an order suspending the registration of a food facility, or as part of evidence submitted for an appeal of an administrative detention order under section 304(h)(4)(A) of the Federal Food, Drug, and Cosmetic Act.

(4) In support of admission of an article of food under section 801(a) of the Federal Food, Drug, and Cosmetic Act; and

(5) To support removal from an import alert through successful consecutive testing.

21 C.F.R. § 1.1107(a).

Here, the record is devoid of any evidence suggesting that Deibel performed or intended to perform food testing covered by the LAAF regulations. As a result, it was not required to abide by the LAAF regulations or obtain accreditation as an LAAF laboratory. *See* 21 C.F.R. §§ 1.1103(b), 1.1107(b). Deibel did obtain a voluntary accreditation from the American Association for Laboratory Accreditation ("A2LA"), a non-governmental entity, to meet its clients' testing expectations, [Doc. 129-1 at 3–4, 24, 32], but nothing in the record suggests that this accreditation somehow brought Deibel within the scope of the LAAF Program or the FDA's jurisdiction more

generally. Plaintiff has not directed the Court to any authority stating that private food testing laboratories like Deibel are subject to FDA regulations outside the LAAF Program, and it is not the Court's obligation to research whether such authority exists on its own. *See, e.g.*, *Nicholson v. Jayco, Inc.*, No. 5:15-cv-2010, 2016 U.S. Dist. LEXIS 134469, at *65 (N.D. Ohio Sep. 29, 2016) ("It is not the Court's obligation to conduct the required research, construct arguments, and frame a legal analysis on any party's behalf."). Accordingly, the Court finds that the undisputed evidence shows that Plaintiff did not "refuse[] to participate in or remain silent about illegal activity." *See Williams*, 465 S.W.3d at 111.

Turning to the fourth element, even if Plaintiff could establish that she had refused to participate in or remain silent about illegal activity, her TPPA claim would still fail as she has failed to show that her claimed refusal was the sole reason for her termination. The Tennessee General Assembly "has chosen to enact a stringent standard and set the bar high for recovery under a retaliatory discharge claim pursuant to the TPPA." *Id.* at 110. A plaintiff employee can prevail on a TPPA retaliatory discharge claim "only if he or she can prove that his or her refusal to participate in or to remain silent about illegal activities was the *only reason* for the termination." *Darnall v. A+ Homecare, Inc*, No. 01-A-01-9807-CV-00347, 1999 Tenn. App. LEXIS 339, at *20 (Ct. App. Jun. 2, 1999) (emphasis added). Here, Plaintiff's poor work performance provided a separate reason to terminate her. *See supra* Subsection III.B.2. As a result, she cannot establish the fourth element of her TPPA claim, *see Williams*, 465 S.W.3d at 115, and her TPPA claim must therefore be dismissed.

## F. Breach of Contract under Tennessee Law

Plaintiff claims she had an employment contract with Deibel that Deibel breached by terminating her.[10] [Doc. 6 at ¶¶ 59–61]. As Plaintiff has failed to rebut the presumption of at-will employment under Tennessee law, this claim must be dismissed.

In Tennessee, employees are presumed to be at-will absent evidence to the contrary. *Keller v. Casteel*, 602 S.W.3d 351, 358 (Tenn. 2020). "Under the employment-at-will doctrine, employment is for an indefinite period of time and may generally be terminated by either the employer or the employee at any time, for any reason, or for no reason at all." *Id.* The termination or resignation of an at-will employee does not constitute a breach of contract. *Id.* To rebut the presumption of at-will employment, "the party seeking to do so must come forward with admissible and relevant evidence to support a finding that the employment relationship was contractual or was for a definite period of time." *Sudberry v. Royal & Sun All.*, 344 S.W.3d 904, 912 (Tenn. Ct. App. 2008). Plaintiff has failed to make such a showing.

Plaintiff's offer letter stated that the terms of her employment were set forth in Deibel's Associate Handbook. [Doc. 129-1 at 82]. This Handbook expressly disclaimed the creation of an employment contract, reiterated that Plaintiff was an at-will employee, and reserved Deibel's right

---

[10] Plaintiff also asserts that even if she was an at-will employee, she could not be terminated for "exposing violations under the U.S. Federal Drug Administration regulations" or for "a discriminatory reason." [Doc. 6 at ¶ 61; *see also* Doc. 130 at 9]. To the extent Plaintiff seeks to reiterate her retaliation and/or discrimination claims through this argument, those claims still fail for the reasons stated herein. To the extent Plaintiff attempts to plead a Tennessee common law retaliatory discharge claim through this assertion, it is not clear she has adequately pled such a claim. In any event, Plaintiff cannot establish a common law retaliatory discharge claim because such claims are subject to the *McDonnell Douglas* burden-shifting framework. *Lawrence v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, No. E2016-02169-COA-R3-CV, 2017 Tenn. App. LEXIS 674, at *22 (Ct. App. Oct. 6, 2017) ("[W]e recognize that the *McDonnell Douglas* burden-shifting analysis is appropriate for…common law retaliatory discharge claims…"); *Day v. Finishing Brands Holdings, Inc.*, No. 13-1089, 2015 U.S. Dist. LEXIS 63064, at *75 (W.D. Tenn. May 14, 2015) ("Tennessee courts follow the *McDonnell Douglas* burden-shifting framework in analyzing retaliatory discharge claims brought under…Tennessee common law."). And as the Court has already noted, Plaintiff's poor work performance provided a legitimate, nondiscriminatory reason for her termination, and she has failed to show this reason was pretextual. *See supra* Subsection III.B.2. Accordingly, if Plaintiff was attempting to bring a common law retaliatory discharge claim, it—like all her other claims—would be subject to dismissal.

23

to "change, modify, amend, supplement, rescind, delete or revise any provision of [the] Handbook, as it deem[ed] necessary or appropriate with or without notice to associates." [*Id.* at 94–95]. Given these disclaimers and the fact that Deibel could unilaterally modify the Handbook as it saw fit, neither the Handbook nor the offer letter which relies on it are sufficient to rebut the presumption of at-will employment. *See Sudberry*, 344 S.W.3d at 912–13.[11]

Beyond these documents, Plaintiff also attempts to rebut the presumption of at-will employment by citing to her "Employee Confidentiality Agreement." [Doc. 130 at 9]. She argues that this Agreement gave her the benefit of "continuing employment" in exchange for her agreeing to its terms, thus rendering her not an at-will employee. [*See id.*; *see also* 130-3 at 40–41 (Employee Confidentiality Agreement)]. Plaintiff is mistaken. The Employee Confidentiality Agreement states the following: "Employee acknowledges and agrees that in consideration for entering into this agreement, he or she has received the benefit of continuing employment, and acknowledges and agrees that in the event that he or she did not enter into this agreement, his or her employment would end." [Doc. 130-3 at 40]. The Agreement did not create a definite term of employment to which Plaintiff was entitled, nor did it alter the circumstances under which Deibel could terminate Plaintiff. [*See id.* at 40–41]. Instead, it merely provided that in exchange for Plaintiff agreeing to the Employee Confidentiality Agreement's terms, Deibel would not exercise its right to terminate Plaintiff at that time. [*See id.* at 40]. Plaintiff has failed to direct the Court to any authority suggesting this is sufficient to rebut Tennessee's presumption of at-will employment,

---

[11] *See also Adcox v. SCT Prods.*, No. 01A01-9703-CV-00123, 1997 Tenn. App. LEXIS 703, at *10 (Ct. App. Oct. 17, 1997) ("We can conceive of no clearer way for an employer to express its intent not to be bound by an employee handbook's provisions than the employer's specific statement that the handbook is not a contract or that the handbook should not be construed as a contract. Even without such a statement, however, the employer's reservation of a unilateral right to modify the provisions of its employee handbook generally would preclude the handbook from being considered part of the employment contract. Inasmuch as the handbook at issue contained both such provisions, we conclude that the trial court properly dismissed the Employees' claims for breach of employment contract[.]" (internal citations omitted)).

and the Court is similarly unaware of any such authority.[12] Accordingly, the Court finds that Plaintiff has failed to rebut the presumption of at-will employment, *see Sudberry*, 344 S.W.3d at 912, and her breach of contract claim must be dismissed.

### G. Intentional and Negligent Infliction of Emotional Distress under Tennessee Law

Plaintiff claims that Defendants intentionally and negligently inflicted emotional distress upon her in violation of Tennessee law. [Doc. 6 at ¶¶ 91–92]. The undisputed evidence, however, shows that Plaintiff can prevail on neither her intentional infliction of emotional distress ("IIED") claim nor her negligent infliction of emotional distress ("NIED") claim. Accordingly, both claims must be dismissed.

To establish either an IIED claim or an NIED claim under Tennessee law, a plaintiff must demonstrate she "suffered a serious mental injury resulting from the defendant's conduct." *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 206 (Tenn. 2012). This requires a plaintiff to show that "'a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case.'" *Id.* at 208 (quoting *Eskin v. Bartee*, 262 S.W.3d 727, 735 n.21 (Tenn. 2008)). In evaluating whether a plaintiff has made this showing, courts consider the following nonexclusive factors:

(1) Evidence of physiological manifestations of emotional distress, including but not limited to nausea, vomiting, headaches, severe weight loss or gain, and the like;

(2) Evidence of psychological manifestations of emotional distress, including but not limited to sleeplessness, depression, anxiety, crying spells or emotional outbursts, nightmares, drug and/or alcohol abuse, and unpleasant mental reactions

---

[12] To the contrary, courts applying Tennessee law regularly assume that an employee remains at-will notwithstanding the fact they are provided "continuing employment" in exchange for executing contracts related to their employment. *See, e.g.*, *Cummings Inc. v. Dorgan*, 320 S.W.3d 316, 336 (Tenn. Ct. App. 2009) ("As an at-will employee, Dorgan's continued employment by Cummings was consideration for his execution of the 2004 Non-Compete Agreement."); *Am. Home Shield Corp. v. Ozur*, No. 16-cv-2400-SHL-tmp, 2016 U.S. Dist. LEXIS 195226, at *11 (W.D. Tenn. Sep. 13, 2016) ("In Tennessee, courts have enforced non-compete provisions against formerly at-will employees when continued future employment served as consideration for the agreements."); *Cent. Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28, 33 (Tenn. 1984).

such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, and worry;

(3) Evidence that the plaintiff sought medical treatment, was diagnosed with a medical or psychiatric disorder such as post-traumatic stress disorder, clinical depression, traumatically induced neurosis or psychosis, or phobia, and/or was prescribed medication;

(4) Evidence regarding the duration and intensity of the claimant's physiological symptoms, psychological symptoms, and medical treatment;

(5) Other evidence that the defendant's conduct caused the plaintiff to suffer significant impairment in his or her daily functioning; and

(6) In certain instances, the extreme and outrageous character of the defendant's conduct is itself important evidence of serious mental injury.

*Id.* at 209–10.

In this case, Plaintiff claims she suffered the following because of the emotional distress Defendants inflicted upon her: "Anxiety, Sleeplessness, Frustration, Irritability, Loss of Enjoyment of Life, Inconvenience, the loss of [her] Appetite, Stomach Aches, Diarrhea, Embarrassment, and being Nauseous at times." [Doc. 130 at 25]. She further claims she has experienced "[t]rouble [c]oncentrating; slight [d]epression; feeling [d]egraded, and [h]umiliated." [*Id.*]. If Plaintiff had directed the Court to any evidence supporting these claims, she may have been able to show she suffered a severe mental injury. Plaintiff, however, has not pointed the Court to *any* evidence suggesting she experienced the injuries listed above, and her bald assertion that she was injured, "completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Brown v. Haiderer*, No. 4:21-cv-11565, 2024 U.S. Dist. LEXIS 112992, at *3 (E.D. Mich. June 17, 2024) (internal quotation marks omitted); *see also* FED. R. CIV. P. 56(c), (e); *Brown v. Mahlman*, No. 1:22-cv-239, 2024 U.S. Dist. LEXIS 11738, at *5 (S.D. Ohio Jan. 22, 2024) ("[A] party's status as a pro se litigant does not alter the party's duty on a summary judgment motion to support his factual assertions with admissible evidence."); *Starks v. W. Meade Place,*

*LLP*, No. 3:05-0442,, at *11 (M.D. Tenn. Sep. 28, 2006) ("The Court recognizes that Plaintiff is proceeding *pro se*. Nevertheless, as the party opposing a properly supported motion for summary judgment, she was required to set forth admissible evidence that supports her case and raises a genuine issue for trial."). Accordingly, Plaintiff's IIED and NIED claims must be dismissed.

That said, the lack of evidence suggesting Plaintiff suffered a severe mental injury is not the only reason her IIED and NIED claims fail. Her NIED claim is barred by the exclusive remedy provision of the Tennessee Workers' Compensation Act. *Bellomy v. Autozone, Inc.*, No. E2009-00351-COA-R3-CV, 2009 Tenn. App. LEXIS 792, at *30–31 (Ct. App. Nov. 24, 2009) (holding that negligent infliction of emotional distress claims arising out of workplace conduct are barred by the exclusive remedy provision); *see also Davidson v. Golden Living Ctr. - Mountainview*, No. 4:09-cv-94, 2010 U.S. Dist. LEXIS 81725, at *16 (E.D. Tenn. Aug. 10, 2010) (same); *Fonseca v. Golden Living Ctr. -Mountainview*, No. 4:09-cv-93, 2010 U.S. Dist. LEXIS 81734, at *16 (E.D. Tenn. Aug. 10, 2010) (same).

As for her IIED claim, it also fails because Plaintiff has failed to show that Defendants' conduct was "so outrageous that it is not tolerated by civilized society[.]" *Rogers*, 367 S.W.3d at 205. "The burden for a plaintiff to demonstrate outrageous conduct is a high burden indeed. Liability…'does not extend to mere insults, indignities, threats, annoyances, petty oppression or other trivialities.'" *Lemon v. Williamson Cnty. Sch.*, 618 S.W.3d 1, 21 (Tenn. 2021) (quoting *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1998)). Rather, liability will only attach "where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* Examples of conduct that meet this exacting standard include: (i) telling a plaintiff your wife is having a seizure before then both shooting your wife in the head and killing yourself in the

plaintiff's presence, *Lourcey v. Estate of Scarlett*, 146 S.W.3d 48 (Tenn. 2004); (ii) making death threats against a plaintiff and firing gunshots near his home, *Levy v. Franks*, 159 S.W.3d 66 (Tenn. Ct. App. 2004); (iii) showing a mother her stillborn child preserved in formaldehyde, *Johnson v. Woman's Hosp.*, 527 S.W.2d 133 (Tenn. Ct. App. 1975); and (iv) informing a plaintiff customer that her nude photographs could not be developed when in fact your employee had developed and kept the photographs, later showing them to others, *Dunn v. Moto Photo, Inc.*, 828 S.W.2d 747 (Tenn. Ct. App. 1991). In contrast, courts consistently hold that being terminated from a job does not amount to outrageous conduct, even where the termination is accompanied or preceded by unlawful discrimination and/or harassment. *See West v. Genuine Parts Co.*, No. 3:11-CV-252, 2011 U.S. Dist. LEXIS 105595, at *7 (E.D. Tenn. Sep. 16, 2011) ("Being terminated from his job, even if such termination is found to be wrongful or discriminatory, does not constitute outrageous conduct for the purposes of the tort of intentional infliction of emotional distress."); *Briordy v. Chloe Foods Corp.*, No. 3:07-0295, 2008 U.S. Dist. LEXIS 15806, at *29 (M.D. Tenn. Feb. 29, 2008) (finding a plaintiff had not been subjected to sufficiently outrageous conduct for her IIED claim to survive summary judgment notwithstanding the fact she was sexually harassed by her supervisor); *Arnett v. Domino's Pizza I, LLC*, 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003) ([D]iscriminatory conduct does not automatically give rise to the imposition of liability for intentional infliction of emotional distress."). Plaintiff was terminated, and Scarbrough may have been as rude and hostile as Plaintiff claims, [*See* Doc. 129-1 at 12–14; 16–17; Doc. 130-1 at ¶ 8], but such conduct is not sufficiently outrageous to support an IIED claim. *See, e.g.*, *Lemon*, 618 S.W.3d at 21.

Accordingly, Plaintiff's IIED and NIED claims would fail even if Plaintiff had provided evidence to show she suffered a severe mental injury because of Defendants' conduct. This further reinforces the Court's conclusion that Plaintiff's IIED and NIED claims must be dismissed.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. 128] is **GRANTED.** Plaintiff's claims against Deibel are **DISMISSED WITH PREJUDICE** and her claims against Scarbrough are **DISMISSED WITHOUT PREJUDICE**. As no claims remain, Defendants' Motions in Limine [Docs. 147–50] are **DENIED AS MOOT**. A separate judgment will enter. There being no more matters to resolve, the Clerk is **DIRECTED** to close the file.

**SO ORDERED.**

/s/ *Charles E. Atchley, Jr.*
**CHARLES E. ATCHLEY, JR.**
**UNITED STATES DISTRICT JUDGE**

29